# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM A. HOWARD, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 17-cv-00203-JPG-CJP ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant.[1] | ) ) |

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff William A. Howard seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI on July 17, 2013, alleging a disability onset date of June 15, 2013. (Tr. 181-94.) His claims were denied initially, and again upon reconsideration. (Tr. 63-80, 83-90.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Laurie Wardell conducted on December 4, 2015. (Tr. 40-62.) The ALJ issued an unfavorable determination thereafter. (Tr. 22-39.) The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-4.) Plaintiff exhausted his administrative remedies and filed a timely Complaint in this Court. (Doc. 1). In the complaint, Plaintiff argues (1) the ALJ erroneously assessed the opinions of his treating physician; (2) the ALJ erred in evaluating the opinions of the state agency consultants; and (3) the ALJ improperly evaluated plaintiff's subjective complaints.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

## Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.[2]

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations— failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant

---

[2] The legal standards for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) are largely the same. The above paragraph in this order cites the relevant statutory provisions for DIB, while the SSI provisions are located at 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D), and 20 C.F.R. § 416.972. Most citations herein are to the DIB regulations out of convenience, but also apply to SSI challenges.

is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## **The ALJ's Decision**

ALJ Wardell determined that plaintiff met the insured status requirements through December 31, 2018 and had not engaged in substantial gainful activity since his alleged onset date. Furthermore, the ALJ opined that plaintiff had a severe impairment of history of a fracture of the left knee with arthrofibrosis and osteonecrosis. She also opined plaintiff had the residual functional capacity (RFC) to perform light work—except he could not kneel, crawl, or climb ladders, ropes, or scaffolds. He could occasionally climb ramps and stairs, stoop, balance, and

crouch. Plaintiff had to avoid all exposure to slippery or uneven surfaces, vibrations, hazards, and operating foot controls with the left lower extremity. The ALJ noted plaintiff was born on November 28, 1961 and was 51 years old on the alleged onset date, which constitutes an individual closely approaching advanced age. She opined transferability of job skills was not material to the determination and although plaintiff could not perform any past relevant work, he was not disabled because other jobs existed that he could perform. (Tr. 27-33.)

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

### 1. Agency Forms

In his agency forms, plaintiff alleged that a broken left knee, high blood pressure, osteoporosis, and heart issues limited his ability to work. Plaintiff had an eighth-grade education and worked as a roofer for the previous fifteen years. Plaintiff could not carry anything or prepare his own meals, other than frozen pizza and sandwiches. His wife put his socks and shoes on for him and assisted him with bathing. Plaintiff had difficulty sitting, standing, walking, and driving for long periods. He also had trouble climbing ladders and stairs. He experienced constant pain in his left knee. Throughout the day, plaintiff ate and watched television. (Tr. 209-10, 255-66.)

### 2. Evidentiary Hearing

Plaintiff, represented by counsel, appeared at an evidentiary hearing on December 4, 2015. He testified he lived with his wife and twenty-seven year-old son. His home had five steps he navigated to get in and out.

Plaintiff could drive for about thirty minutes to an hour. He could not lift any weight without knee pain. His left knee popped, swelled, and was painful when he walked. Plaintiff began using a cane after knee surgery in 2013, but then stopped using it until about a year before the hearing. Plaintiff's doctor recommended a knee replacement in the future. Plaintiff received injections in the past, which did not help much. His doctor instructed him not to stand for "prolonged" periods; plaintiff could stand for about fifteen minutes without pain. He could sit for about thirty minutes before his knee began hurting. (Tr. 40-62.)

Plaintiff was unable to help around the house and his only hobby was watching television. He had to prop his leg up for thirty-minute periods throughout the day, for a total of a couple hours. (*Id.*)

A vocational expert (VE) also testified at the hearing. The VE first considered a hypothetical individual with plaintiff's age, education, and the ability to perform light work, except that he could not kneel or crawl; could occasionally climb ramps and stairs, but not ladders, ropes, or scaffolds; could occasionally balance, but not on wet or uneven surfaces; and could not operate foot controls with the left extremity or work around hazards. The VE opined jobs existed that accommodated for the hypothetical individual's limitations. (*Id.*)

The VE then considered the same hypothetical as above, with an additional limitation that the person had to sit for five minutes after standing for an hour, while remaining on task. The VE opined there were no available jobs that accommodated for the set of limitations. Furthermore, there were no transferable skills to sedentary positions. (*Id.*)

### 3. Medical Records

Plaintiff presented to the Union Hospital emergency room on March 7, 2013 for pain in his left knee that had persisted for one month. Physical examination showed abnormal, mild

swelling in plaintiff's right knee and pain with active range of motion of plaintiff's left knee. His motor strength was normal. Images of plaintiff's left knee did not demonstrate effusion, fracture, or dislocation. Plaintiff received a prescription for Naprosyn and was advised to follow-up with Dr. Belmar. He was also instructed to limit his bending and squatting. (Tr. 349-53.)

An MRI of plaintiff's left knee from June 17, 2013 demonstrated osteonecrosis of the lateral femoral condyle; old osteonecrosis of the weight-bearing surface medial femoral condyle; focal subchondral marrow edema of the trochlear groove; and mild prepatellar bursitis. (Tr. 379.)

On July 11, 2013, plaintiff returned to the emergency room at Union Hospital with acute left knee pain and swelling. He injured his knee after falling earlier that day while using crutches. X-rays revealed a condylar-type fracture of his lateral condyle. An MRI showed osteonecrosis of the left lateral condyle. Dr. Ulrich performed an open reduction, internal fixation of the left lateral condyle on July 12, 2013. Plaintiff was discharged in stable condition on July 15, 2013. (Tr. 305-27.)

Plaintiff followed-up with a nurse practitioner on July 22, 2013. He complained of muscle spasms, had protected weight bearing, and used a walker. X-rays revealed moderate degenerative changes of the left knee. Alignment was maintained along the lateral condyle. Physical examination showed moderate effusion of plaintiff's left knee and a range of motion at +5 to about thirty-degrees. The nurse practitioner recommended plaintiff to remain non-weight bearing and follow-up in two weeks. (Tr. 384-86.)

During a follow-up appointment on August 6, 2013, Dr. Ulrich noted plaintiff was doing very well and his incision was healed. Plaintiff denied pain, swelling, or weakness. X-rays of plaintiff's left knee demonstrated good alignment of the lateral condylar surface and healing of

6

the osteonecrotic area. Plaintiff received a short-hinged brace and Dr. Ulrich recommended plaintiff to remain non-weight bearing. (Tr. 380-83.)

Plaintiff followed-up with Dr. Ulrich on August 14, 2013. X-rays showed good reduction of the condylar fracture and knee creations in good position. Dr. Ulrich noted plaintiff was doing well and his incision was healed. He instructed plaintiff to begin physical therapy. Dr. Ulrich also recommended that plaintiff remain non-weight bearing and participate in range of motion and quad strengthening. Plaintiff was scheduled to follow-up in three weeks and begin weight bearing at that time. (Tr. 468-71.)

Plaintiff began physical therapy on August 28, 2013. At his initial evaluation, plaintiff reported he needed assistance dressing, was unable to drive, and was non-weight bearing in the left lower extremity. On examination, plaintiff demonstrated a decrease in range of motion of the left knee and decreased strength. His knee flexion was significantly limited. The therapist instructed plaintiff to remain non-weight bearing until his next follow-up appointment with his doctor and to remove his knee brace only to perform exercises. The therapist opined plaintiff needed approximately one month of therapy. (Tr. 462-65.)

On September 5, 2013, plaintiff attended a follow-up appointment with Dr. Ulrich and was non-weight bearing with a walker. X-rays showed good healing. Dr. Ulrich instructed plaintiff to begin functional rehab and progressive weight bearing, use his hinged brace, and follow-up in three weeks. (Tr. 444-46.)

On September 26, 2013, plaintiff presented to Dr. Ulrich and demonstrate a five-degree flexion contracture but was only able to flex to about ninety-degrees. Dr. Ulrich suggested plaintiff proceed with arthroscopy manipulation under anesthesia of the left knee for arthrofibrosis, followed by post-operative rehab. (Tr. 501-03.)

7

On October 1, 2013, Dr. Ulrich performed a major synovectomy of plaintiff's left knee. (Tr. 491-92.)

Plaintiff followed-up with Dr. Ulrich's office on October 11, 2013 and was treated by a nurse practitioner. Plaintiff used crutches to ambulate and his range of motion was +10 to only ninety-degrees. Plaintiff received a knee brace and a refill for his Norco prescription. (Tr. 499-501.)

Plaintiff followed-up with Dr. Ulrich's office on October 31, 2013. His extension was full and his flexion was to 110. An x-ray of plaintiff's left knee showed significant narrowing along the medical joint space and a cystic formation along the femoral compartment. Dr. Ulrich recommended dynamic splinting and continuing water therapy to remove motion strength. He noted plaintiff used a cane for mild assistance. (Tr. 496-97.)

On November 1, 2013, Dr. Ulrich completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." Dr. Ulrich indicated plaintiff could not lift or carry items ten pounds or more; plaintiff could sit for four hours, stand for one hour, and walk for one hour at a time without interruption; plaintiff could sit for a total of four hours, stand for a total of one hour, and walk for a total of one hour in an eight-hour workday; and a cane was medically necessary for plaintiff to ambulate. Dr. Ulrich further opined plaintiff could frequently reach overhead and in all directions, handle, finger, feel, and push/pull with both hands. He could also frequently operate foot controls with both feet. Plaintiff could never climb stairs, ramps, ladders, or scaffolds, or balance, stoop, kneel, crouch, or crawl. Plaintiff could never work at unprotected heights or with moving mechanical parts. He could frequently operate a motor vehicle. Plaintiff could continuously work in humidity, wetness, extreme heat and cold, and around vibrations,

8

dust, odors, fumes, and pulmonary irritants. Dr. Ulrich opined these limitations would persist for twelve consecutive months. (Tr. 477-82.)

Plaintiff followed-up with Dr. Ulrich's office on December 4, 2013. Dr. Ulrich opined plaintiff was doing very well with the dynamic splints and his range of motion improved to 0/120 of flexion. Plaintiff walked without antalgia and his quad tone was improving. He still experienced some residual swelling of the knee. Dr. Ulrich opined plaintiff could "return to essentially full activity of daily living." However, he recommended that plaintiff refrain from any roofing because his recovery would continue for a year. (Tr. 493-94.)

Plaintiff was discharged from physical therapy on December 17, 2013. He attended a total of twenty-six sessions. At his final evaluation, plaintiff was independent, with difficulty carrying. He rated his overall perceived improvement at ninety-five percent. Plaintiff's muscle testing was 5/5 throughout and he achieved all of his therapy goals. (Tr. 521-24.)

On May 28, 2014, plaintiff presented to Dr. James Turner for right knee pain and swelling. A physical examination demonstrated large joint degenerative changes, crepitus, and instability in plaintiff's knee. Dr. Turner referred plaintiff to St. Ann due to financial issues. (Tr. 526-27.)

Plaintiff presented to St. Ann Clinic on August 1, 2014 with complaints of left knee pain. The physician noted plaintiff used a cane. Plaintiff was instructed to take Tylenol arthritis and try ice and elevation. (Tr. 529.)

Images of plaintiff's left knee from August 21, 2014 showed small densities posterior to the distal femur, which appeared new since the last study, and some sclerosis posteriorly in the lateral femoral condyle. (Tr. 563-64.)

9

Plaintiff presented to Dr. Ulrich on September 25, 2014 with pain and swelling in his knees. X-rays revealed the joint space was well maintained but there was a defect in plaintiff's posterolateral femoral condyle. Dr. Ulrich diagnosed plaintiff with early post-traumatic arthrosis of the lateral femoral condyle. He recommended injections. (Tr. 576-77.) Dr. Ulrich administered a steroid injection in plaintiff's left knee on October 3, 2014. (Tr. 578.)

On October 30, 2014, Dr. Ulrich wrote a letter regarding plaintiff's status and opined plaintiff would likely require arthroplasty of the left knee due to his development of post-traumatic arthrosis. Dr. Ulrich recommended no climbing, prolonged standing, kneeling, squatting, or lifting greater than twenty pounds. He stated these limitations were permanent. (Tr. 566.)

On July 23, 2015, plaintiff reported again to Dr. Ulrich and reported pain and popping in his left knee. He walked with a minimal antalgia and had no significant swelling. Radiographs revealed maintenance of the joint space and a healed osteochondral fracture of the lateral femoral condyle. Overall, Dr. Ulrich noted plaintiff's symptomatology was not unusual. He recommended a Viscosupplementation trial, corticosteroid injection, and/or a repeat arthroscopy. Plaintiff opted for the Viscosupplementation. (Tr. 573-75.) Dr. Ulrich injected plaintiff's left knee with OrthoVisc on three occasions in August and September of 2016. (Tr. 581, 580, 570-72.)

4. **State Agency RFC Assessments**

State agency consultant Dr. Richard Smith assessed plaintiff's RFC on September 24, 2013. Dr. Smith opined plaintiff could perform light work, except that he could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; could frequently balance and

10

stoop; and could occasionally kneel, crouch, and crawl. He should also avoid concentrated exposure to hazards. (Tr. 77-79.)

Dr. Sandra Bilinsky also assessed plaintiff's RFC on March 21, 2014. She concluded plaintiff could perform light work. (Tr. 97-98.)

**Analysis**

Plaintiff contends the ALJ erroneously evaluated the medical opinions from plaintiff's treating source and the state agency consultants and improperly assessed plaintiff's subjective complaints.

The Social Security Regulations require an ALJ to consider any medical opinion against the checklist of factors in 20 C.F.R. § 404.1527(c): (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization.

Moreover, an ALJ should afford the most weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Id.* at § (c)(2). Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and continue to apply the aforementioned factors.

In October 2014, plaintiff's treating source, Dr. Ulrich, opined plaintiff was limited to lifting twenty pounds, could not climb, kneel, or squat, and could not stand for "prolonged" periods. The ALJ's RFC assessment is consistent with Dr. Ulrich's opinion, except that it excludes the "prolonged standing" restriction. The ALJ explained she gave "some weight" to Dr. Ulrich's opinions, but only "to the extent that they are consistent with the [RFC]." (Tr. 31.)

11

The ALJ's post-hoc statement is deficient and contrary to the Regulations. It suggests she made an RFC assessment and then evaluated the medical opinions, which clearly distorts the disability determination process. *Cf. Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). Moreover, by only accepting opinions that supported her assessment, the ALJ impermissibly "play[ed] doctor." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). An ALJ cannot reject evidence from medical experts because they are not in accord with her own lay opinion. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

Aside from these obvious errors, the ALJ also failed to address whether Dr. Ulrich's "prolonged standing" restriction was consistent with the rest of the medical evidence or whether he supported the opinion with acceptable techniques. The ALJ neither supplied a "good" reason for rejecting the opinion nor considered any of the checklist of factors from 20 C.F.R. § 404.1527(c). Notably, the Seventh Circuit has not clearly articulated whether an ALJ must expressly list the factors or even consider all of them.[3] However, the ALJ's opinion does not suggest that she even considered the factors.

The ALJ stated, "The undersigned notes that Dr. Ulrich did not provide a definition for prolonged standing." (Tr. 31.) The ALJ was not entitled to summarily dismiss the statement on this basis. Rather, she had a duty to solicit additional information from Dr. Ulrich for clarification. SSR 96-2p, at *4.

---

[3] In *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010), the Seventh Circuit remanded a case where "[t]he ALJ's decision indicate[d] that she considered opinion evidence in accordance with [the regulations]" but did not "explicitly address the checklist of factors as applied to the medical opinion evidence." *Campbell*, 627 F.3d at 308. However, in *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013), the Seventh Circuit stated that "while the ALJ did not explicitly weigh each factor in discussing [the treating physician's] opinion, his decision makes clear that he was aware of and considered many of the factors . . ." . *See also Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008) (where the ALJ did not err, even though he addressed only two of the six factors); *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (stating, "The ALJ did not explicitly weigh every factor while discussing her decision to reject [the treating physician's] reports, but she did note the lack of medical evidence supporting [the] opinion . . . and its inconsistency with the rest of the record.").

Moreover, plaintiff explained at the hearing that he could not stand for more than fifteen minutes without pain. The ALJ, however, discredited plaintiff's subjective complaints because,

> [n]otes from physical examinations indicate that since recovering from knee surgery, he has been able to walk unassisted with only a slightly antalgic gait, that his lower extremity is without swelling and that there is some crepitance of the left knee. . .In addition, his treating physician noted that his knee was doing well after surgery. The record does not indicate that the claimant still needs to use an assistive device while walking, that he needs to elevate his lower extremity during the day or that he needs to undergo further surgery on his left knee.

(Tr. 30.)

To the contrary, in October 2014, Dr. Ulrich opined plaintiff would "most likely" require arthroplasty of the left knee due to his development of post-traumatic arthrosis. Moreover, the record does not contradict plaintiff's assertion that he needed a cane. Plaintiff testified he did not use an assistive device for about a year after surgery, but then required one following that period. There are no "notes from physical examinations" stating plaintiff walked unassisted during this time. In fact, in August 2014, a doctor noted that plaintiff used a cane. Ultimately, due to the ALJ's misstatement of the record, the substantial evidence does not support her evaluation of plaintiff's subjective complaints.

Furthermore, the ALJ's exclusion of the prolonged standing restriction from the RFC was prejudicial to plaintiff. At plaintiff's evidentiary hearing, the VE considered an individual with plaintiff's age, education, prior work experience, and the ultimate RFC finding, who also had to sit for five minutes after standing for an hour. The VE testified that the individual could not perform plaintiff's past work or any other light work. The VE also opined there would be no transferability of skills from plaintiff's roofing position. (Tr. 60-62.)

Additionally, SSR 83-12 explains:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either

> sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

Thus, it is unclear whether plaintiff could perform light work if he was unable to stand for prolonged periods as contemplated in SSR 83-12.

Due to these errors, substantial evidence does not support the ALJ's decision. The ALJ's evaluation of the treating source's opinions and plaintiff's subjective complaints warrants remand. The Court will therefore not address plaintiff's remaining arguments.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: FEBRUARY 14, 2018**

> **s/ *J. Phil Gilbert*** 
> **J. PHIL GILBERT** 
> **DISTRICT JUDGE**